# Exhibit A

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("**Agreement**") dated November 21, 2014, by and between,

**HERITAGE HILLS ASSOCIATES**, a Pennsylvania limited partnership, with a mailing address of 2700 Mt. Rose Avenue, York, Pennsylvania 17402 (the "**Borrower**"),

and

**CROWN BANK** (the **"Bank"**), having a mailing address of 27 Prince Street, Elizabeth, New Jersey 07208.

## Background

The Borrower, as hereinafter set forth, is or is about to become, the owner in fee simple of the following certain real property designated as UPI 46-000-IJ-0019, 46-000-IJ-0020, 46-000-IJ-0021F and 54-000-IJ-0022, all on the tax map of the Townships of York and Springettsbury and located at 2690 and 2700 Mt. Rose Avenue, Townships of Middletown and Springettsbury, County of York and Commonwealth of Pennsylvania, as more fully described in Exhibit A attached hereto and made a part hereof (the "**Real Property**"). The Real Property and the Improvements are sometimes collectively referred to herein as the "**Mortgaged Property**."

The Borrower desires to borrow from the Bank and the Bank, subject to the terms and conditions set forth herein, is prepared to lend to the Borrower the sum of Ten Million and 00/100 ($10,000,000.00) Dollars in order to (a) refinance a commercial mortgage on the Mortgaged Property, (b) finance renovations on the Mortgaged Property and (c) finance costs incurred in connection with the closing of the transaction contemplated herein. In connection therewith, the Bank issued its commitment letter to the Borrower on October 2, 2014, as amended (the "**Commitment**").

**NOW THEREFORE**, in consideration of the premises, and of the mutual promises and undertakings of the parties set forth herein, and with the intention of being legally bound hereby, the parties hereto agree as follows:

1. The Loan.

(a) Purpose and Amount. On the date hereof, the Bank is lending to the Borrower the sum of Ten Million and 00/100 ($10,000,000.00) Dollars (the "Loan") for the purpose of (i) refinancing a commercial mortgage on the Mortgaged Property, (ii) financing renovations on the Mortgaged Property, and (iii) financing costs incurred in connection with the closing of the transaction contemplated herein.

(b) Loan Documents; Security.

(i) The Borrower's obligation to repay the Loan and any other sums loaned to the Borrower by the Bank hereunder is evidenced by the Borrower's promissory note dated this date in the Principal Sum of Ten Million and 00/100 ($10,000,000.00) Dollars (the "**Note**"), providing for the payment of principal, together with interest thereon at the rate set forth therein, in such installments, at such times, and according to such further terms as set forth in the Note.

(ii) As security for the Note and all of the Borrower's obligations thereunder and hereunder, the Borrower shall execute and deliver to the Bank or cause to be executed and delivered to the Bank, as the case may be, the following:

(A) A first lien Open-End Mortgage and Security Agreement encumbering the Mortgaged Property and all building materials, fixtures, machinery and equipment owned by Borrower and necessary or incidental to the general operation and maintenance of the Mortgaged Property, and all renewals and replacements thereof or additions thereto, all as more specifically described in the Mortgage (the "**Mortgage**").

(B) A first and absolute assignment of all of the Borrower's right, title and interest in and to any and all present and future leases and agreements of lease affecting the Mortgaged Property or any part thereof ("**Assignment of Rents and Leases**").

(C) Uniform Commercial Code financing statements executed by Borrower in favor of the Bank perfecting the Bank's security interests granted pursuant to the Mortgage in all tangible and intangible personal property now owned or hereafter acquired by the Borrower and located on or used in connection with the Mortgaged Property (the "**UCCs**").

(D) A Security Agreement (the "**Security Agreement**") granting a first lien security interest on all assets of Borrower, as more fully set forth in the Security Agreement, including but not limited to accounts, accounts receivable, inventory, goods, machinery, equipment, furniture, fixtures, chattel paper, instruments, documents, merchandise, supplies, general intangible, money securities, contract rights, and proceeds including insurance proceeds and products thereof, now owned or hereafter acquired.

(E) An Environmental Indemnity Agreement ("**Environmental Indemnity**") executed by the Borrower, Matthew J. DeRose and Joann DeRose, (jointly and severally, the "**Environmental Indemnitors**") in favor of the Bank pursuant to which the Borrower and Environmental Indemnitors, jointly and severally, will indemnify, defend and hold the Bank harmless from and against all costs, claims, liability or expense arising in connection with Environmental Laws, Regulated Substances, or Contamination as such terms are defined in the Environmental Indemnity.

(F) Guarantees of Payment ("**Guarantees**") executed by Matthew J. DeRose and Joann DeRose (jointly and severally the "**Guarantors**") in favor of the Bank pursuant to which each Guarantor guarantees and becomes surety for the payment of the principal amount outstanding under the Loan from time to time, together with all interest thereon and the timely payment of monthly principal and interest required under the Note and the payment of all carrying costs necessary for the operation and maintenance of the Mortgaged Property.

(F) A cash collateral agreement (the "**Collateral Agreement**"), terms and conditions of which are incorporated herein, executed by the Borrower in favor of

the Bank wherein the Borrower, inter alia, pledges a Cash Collateral Account, as defined therein, to the Bank as security for the Loan.

(iii) The Borrower shall execute and deliver, or cause to be executed and delivered, such additional documents and instruments as the Bank shall reasonably require in order to perfect the Bank's interest in any of the foregoing property. The Note, Mortgage, Assignment of Leases and Rents, UCCs, the Security Agreement, the Environmental Indemnity, the Guaranty, the Collateral Agreement, and other documents and instruments referred to above (all of which, together with this Agreement (as from time to time amended, restated and extended) and the Commitment are hereinafter collectively referred to as the "**Loan Documents**") shall be in form and substance satisfactory to the Bank, and all necessary filing and recording fees with respect thereto shall be paid by the Borrower.

The term **"Obligor"** as used in this Agreement shall mean, individually and collectively, the Borrower, any guarantor, and any Indemnitor.

2. **Representations and Warranties**. The Borrower hereby represents and warrants to the Bank (which representations and warranties shall survive until the Loan has been paid in full) that as of the date hereof:

(a) Formation; Existence; Composition. The Borrower is a limited partnership validly existing and in good standing in the Commonwealth of Pennsylvania and has the power and authority to own and operate the Mortgaged Property in the Commonwealth of Pennsylvania. Matthew J. DeRose is the General Partner of the Borrower. True and correct copies of the Borrower's Amended and Restated Limited Partnership Agreement and Limited Partnership Certificate, together with all amendments thereto (collectively "**Organizational Documents**"), have been furnished to the Bank and the same are in full force and effect as of the date of this Agreement.

(b) Power and Authority; Authorization; Enforceability. The Borrower has full power, authority and legal right to execute, deliver and comply with each of the Loan Documents to which it is a party and any other document or instrument relating to the Loan to be executed by the Borrower, all actions of the Borrower and other authorizations necessary or appropriate for the execution and delivery of and compliance with the Loan Documents and such other documents and instruments have been taken or obtained and the Loan Documents and such other documents and instruments constitute the respective valid and legally binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(c) Governmental Approval of Loan Documents. No consent, approval, or other authorization of or by any court, administrative agency, or other governmental authority is required in connection with the Borrower's execution and delivery of or compliance with any of the Loan Documents or any other document or instrument relating to the Loan executed by the Borrower.

(d) Conflict; Breach. The Borrower's execution and delivery of and compliance with the Loan Documents will not conflict with or result in a breach of any applicable law, judgment, order, writ, injunction, decree, rule, or regulation of any court, administrative agency, or other governmental authority, or of any provision of the Borrower's Organizational Documents or of

any agreement or other document or instrument to which the Borrower is a party or by which the Borrower or any of its property is bound, and such actions by the Borrower will not result in the creation or imposition of any lien, charge or encumbrance upon any property of the Borrower or of anyone other than the Bank.

(e) Litigation. There is no action, suit or proceeding pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or the Mortgaged Property before or by any court, administrative agency, or other governmental authority that is not covered by insurance, or which brings into question the validity of the transactions contemplated hereby.

(f) Compliance With Laws. The Mortgaged Property, and the use thereof, complies in all material respects with all applicable zoning, fire, electrical, safety, building and land use codes, laws and regulations.

(g) Title to the Mortgaged Property. The Borrower has, or simultaneously with the consummation of the Loan will have, good and marketable, equitable and beneficial title to the Mortgaged Property, subject to no lien, charge, or encumbrance except such as are listed as unomitted exceptions to title or exclusions from coverage in the title insurance policy being issued by Dominion Abstracting, Inc., as agent for Old Republic National Title Insurance Company (the "**Title Company**"), to the Bank concurrently with the recording of the Mortgage.

(h) Title to Personal Property. All personal property with respect to which the Borrower has granted to the Bank a security interest pursuant to any of the Loan Documents is otherwise owned by such Borrower is free and clear of all liens, encumbrances, and security interests.

(i) Bankruptcy; Insolvency. Neither the Borrower, any general partner of Borrower, if applicable, nor any other Obligor, as the case may be, has applied for or consented to the appointment of a receiver, trustee or liquidator of itself, himself or herself or any of its, his or her property, admitted in writing its, his or her inability to pay its, his or her debts as they mature, made a general assignment for the benefit of creditors, been adjudicated as bankrupt or insolvent or filed a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it, him or her in any proceeding under any such law, and no action has been taken by it, him or her for the purpose of effecting any of the foregoing. No order, judgment or decree has been entered by any court of competent jurisdiction approving a petition seeking reorganization of the Borrower, any general partner of the Borrower, if applicable, or any other Obligor, or all or a substantial part of the assets of the Borrower, any general partner of the Borrower, if applicable, or any other Obligor, or appointing a receiver, sequestrator, trustee or liquidator of it, him or her or any of its, his or her property.

3. **Covenants**. The Borrower covenant(s) and agree(s) that, until the Loan has been paid in full:

(a) Compliance with Laws. The Mortgaged Property shall be operated and maintained in accordance with all applicable laws, rules and regulations relating thereto.

(b) Commercial Leases. The Borrower shall not enter into any commercial lease or similar agreement for space in the Mortgaged Property without obtaining the Bank's prior written approval of all of the terms and conditions thereof, and once approved, the Borrower shall not materially amend or modify or cancel any such commercial lease or similar agreement except as specifically provided for therein without obtaining the Bank's prior written approval.

(c) Additional Financing. The Borrower shall not incur any additional indebtedness (except trade payables and equipment financing) whether or not secured by any lien or security interest on the Mortgaged Property or any other property encumbered in favor of the Bank to secure the Loan without obtaining the Bank's prior written consent thereto.

(d) Status of Title to Mortgaged Property. The Borrower shall not transfer control or ownership of the Mortgaged Property or any part thereof, directly or indirectly, voluntarily or involuntarily, without the prior written approval of the Bank. Without the prior written consent of the Bank, the Borrower shall not create or permit to exist any lien, encumbrance or security interest in favor of any third party with respect to the Mortgaged Property or any property owned by the Borrower, whether or not a fixture, installed thereon or stored thereat and the Borrower shall keep all such property free from any such lien or security interest other than those created in favor of the Bank pursuant to the Loan Documents and liens for taxes not yet due and payable. In general, the Borrower shall keep the title to the Mortgaged Property good and marketable and free of any matter which would prevent any title insurance company from certifying the lien of any mortgage to be executed in favor of a permanent lender or other mortgagee in substitution for or in payment of the Loan, as other than a good and valid first lien upon the Mortgaged Property.

(e) Environmental Matters. The Borrower will not, and will not permit any tenant or other occupant of the Mortgaged Property to, store, use, generate, treat or dispose of any Regulated Substances (as that term is defined in the Environmental Indemnity Agreement) on the Mortgaged Property in violation of any applicable federal, state or local laws or regulations. The Borrower promptly shall advise the Bank in writing of and with respect to any pending or threatened claim, demand or action by any governmental authority or third party relating to any Regulated Substances affecting the Mortgaged Property of which the Borrower has actual knowledge or the discovery of any Regulated Substances at the Mortgaged Property or on any real property adjoining or in the vicinity of the Mortgaged Property.

(f) Financial Statements.

(i) Borrower shall promptly submit to the Bank such information relating to the Borrower's affairs (including but not limited to annual financial statements and tax returns) or any security for the Loan as the Bank may reasonably request.

(ii) Borrower shall supply, and shall cause the Guarantors to supply, to the Bank a copy of the Borrower's and Guarantors' federal tax returns annually within thirty (30) days of filing, as well as an updated personal financial statements of the Guarantors on the Bank's form.

(iii) Borrower represents and warrants that the latest financial statements provided to the Bank are true, complete and accurate in all material respects and fairly present the financial condition, assets and liabilities, whether accrued, absolute, contingent or otherwise, and the results of the Borrower's operations for the period specified therein.

(g) Additional Financial Information. The Borrower shall furnish to the Bank such additional financial statements and reports, asset verification, and other information as the Bank may request from time to time.

(h) Intentionally left blank.

(i) Maintenance of Existence; Single Purpose; No Guaranties.

(a) The Borrower shall maintain its existence as a limited partnership under the laws of the state of their formation and in the Commonwealth of Pennsylvania and authorized to do business in the Commonwealth of Pennsylvania, and shall maintain Matthew J. DeRose as its General Partner. The Borrower shall advise the Bank of the nature of any material changes in the Borrower's Organizational Documents promptly after any such changes and the Borrower shall not change its fiscal year or change its Organizational Documents in any manner which would affect its ability to perform any of its obligations under any of the Loan Documents, without in each case obtaining the prior written approval of the Bank. The Borrower shall not engage in any other business, venture or undertaking except the ownership, development, operation and maintenance of the Mortgaged Property. The Borrower shall not assume, guarantee, endorse, or otherwise become contingently liable upon, or responsible for, any obligations of others, except to endorse checks or drafts in the ordinary course of business. No equity ownership in the Borrower may be transferred, pledged or encumbered, directly or indirectly, without the prior written consent of the Bank.

(j) Principal Office. The Borrower shall maintain its principal office and/or the office where it keeps its books and records at 2700 Mt. Rose Avenue, York, Pennsylvania 17402, unless it gives the Bank prior written notice of any proposed change in location thereof.

(k) Books and Records. The Borrower shall keep complete and accurate books and records in accordance with generally accepted accounting principles consistently applied. The Borrower shall furnish to the Bank all such written information relating to its affairs as may be reasonably requested by the Bank from time to time.

(l) Audit. The Bank shall have the right at any time and from time to time to audit the books and records of the Borrower and the Borrower shall be obligated to make available for any such audit all books, records and other information that the Bank may reasonably request for such purpose and to cooperate fully with the Bank in connection therewith.

(m) Changed Circumstances. The Borrower shall promptly notify the Bank of any material change in any fact or circumstance represented or warranted by the Borrower herein and in any other documents furnished to the Bank in connection with this Agreement.

(n) Bank's Fees and Costs. The Borrower shall pay or reimburse the Bank for all other reasonable costs and expenses incurred by the Bank in connection with the preparation, review, modification and, after the occurrence of an Event of Default hereunder, enforcement of the Loan Documents and collection of the Loan.

(o) Additional Appraisals. If the Bank reasonably determines that the value of the Mortgaged Property may have materially diminished since the date of this Agreement or there is an Event of Default, then the Bank shall have the right to obtain an updated appraisal in form and substance satisfactory to the Bank meeting the same requirements as the initial appraisal required by the Commitment. The Borrower shall be required to pay for any such appraisal obtained once every five (5) years during the term of the Loan.

(p) Bank Account(s). The Borrower shall maintain with the Bank a deposit account from which all monthly payments due under the Note and the other Loan Documents shall be debited. Failure to maintain this account during the term of this Agreement shall, at the option of the Bank, (i) be an Event of Default hereunder and under the terms of the other Loan Documents, or (ii) shall cause the Bank to increase the interest rate under the Note by one half of one percent.

4. **Maximum Rate of Interest on Loan.** Notwithstanding anything to the contrary contained herein or in any other document executed in connection with the Loan, the effective rate of interest on the Loan shall not exceed the maximum effective rate of interest permitted by applicable law or regulation. The Bank hereby agrees not to collect knowingly any interest from the Borrower in the form of fees or otherwise which will render the Loan usurious. In the event that such interest would be usurious in the Bank's opinion, the Bank reserves the right to reduce the interest payable by the Borrower. This provision shall survive the closing and repayment of the Loan.

5. **Limitation of Bank's Liability.** The rights and benefits of this Agreement shall not inure to the benefit of any third party, except as provided in paragraph 10(c) of this Agreement. Notwithstanding anything to the contrary contained in this Agreement or in any of the other Loan Documents, or any conduct or course of conduct by the Borrower or the Bank or their respective affiliates, agents or employees, neither this Agreement nor any such Loan Documents shall be construed as creating any rights, claims or causes of action against the Bank in favor of any person or entity other than the Borrower.

6. **Indemnity.** The Borrower, for itself and all those claiming under or through it, agrees to protect, indemnify, defend and hold the Bank, and its respective directors, officers and employees harmless, from and against any and all liability, expense, or damage of any kind or nature and from any suits, claims or demands, including reasonable legal fees and expenses, arising out of this Agreement or in connection therewith including, without limitation, claims for brokerage and finder's fees in connection with the Loan. This obligation specifically shall survive the repayment of the Loan.

7. **Default.**

(a) Events of Default. The occurrence of any one or more of the following events shall, at the sole option of the Bank, constitute an Event of Default hereunder:

(i) The Borrower shall fail to make any payment of principal, and/or interest, and/or real estate taxes and insurance escrow, as applicable, due to the Bank under the Note or under any of the other Loan Documents within ten (10) days after the same shall become due and payable, whether at maturity or by acceleration or otherwise;

(ii) Except as otherwise specifically provided for in this Agreement, the Borrower shall fail to observe or perform any of the covenants or agreements on its part to be observed and performed under this Agreement or under any of the other Loan Documents within thirty (30) days after written notice from the Bank of such non-compliance, provided however that if such non-compliance cannot be cured within such thirty (30) day period, and the Borrower is not otherwise in default under the terms of this Note and the Loan Documents, Borrower shall be afforded up to an additional thirty (30) days to cure such default so long as such time to cure does not require an extension of the Maturity Date and provided the Borrower shall have commenced such cure within such initial thirty (30) day period and shall thereafter diligently continue to cure such default;

(iii) Any representation or warranty under any Loan Document shall be untrue in any material respect when made;

(iv) Any Event of Default shall occur under the terms of any Loan Document or under any document evidencing or securing any other loan or credit facility from the Bank to the Borrower;

(v) There shall be a material adverse change in the financial condition of the Borrower, any general partner of Borrower, if applicable, or any other Obligor, as reasonably determined by the Bank;

(vi) The Borrower, any general partner of the Borrower, if applicable, or any other Obligor shall apply for or consent to the appointment of a receiver, trustee or liquidator of itself, himself or herself or any of its, his or her property, admit in writing its, his or her inability to pay its, his or her debts as they mature, make a general assignment for the benefit of creditors, be adjudicated a bankrupt, insolvent or file a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it, him or her in any proceeding under any such law, or if action shall be taken by the Borrower, any general partner of the Borrower, if applicable, or any other Obligor for the purpose of effecting any of the foregoing;

(vii) Any order, judgment or decree shall be entered by any court of competent jurisdiction, approving a petition seeking reorganization of the Borrower, any general

partner of the Borrower, if applicable, or any other Obligor or of all or a substantial part of the assets of the Borrower, any general partner of the Borrower, if applicable, or any other Obligor, or appointing a receiver, sequestrator, trustee or liquidator of the Borrower, any general partner of the Borrower, if applicable, or any other Obligor or any of their property, and such order, judgment, or decree shall not be dismissed within sixty (60) days;

(viii) The Mortgaged Property shall be materially injured or destroyed by fire or other casualty for which the cost of restoration is not fully insured or, if fully insured, the Borrower has failed to deposit or cause to be deposited with the Bank sufficient funds to cover the cost of restoration with the Bank in accordance with the terms of the Mortgage;

(ix) Except as may be otherwise specifically permitted herein, any change in the ownership of the Mortgaged Property or the equity ownership of the Borrower without the prior written consent of the Bank, which may be granted or withheld in the Bank's sole judgment;

(x) The death of any individual obligated for all or any portion of the Borrower's obligations under the Loan unless the Bank has been provided with a replacement obligor satisfactory to the Bank in the Bank's sole, non-reviewable judgment within ninety (90) days of the Obligor's death.

(b) <u>Acceleration and Remedies</u>. Upon the occurrence of any Event of Default hereunder, in addition to any other rights or remedies available to it hereunder or under any other Loan Document or at law or in equity granted in any of the Loan Documents, the Bank may declare the outstanding principal balance of the Loan, together with all accrued and unpaid interest thereon and all other sums due hereunder or under any of the other Loan Documents, to be immediately due and payable in full.

(c) <u>Remedies Cumulative, etc</u>.

(i) No right or remedy conferred upon or reserved to the Bank under any of the Loan Documents, or with respect to any guaranty of payment of the Loan or of performance of any of the Borrower's obligations under any of the Loan Documents or any collateral securing the payment of the Loan under any of the Loan Documents (such guaranty and such other collateral, collectively, the "**Collateral**"), now or hereafter existing at law or in equity or by statute or other legislative enactment, is intended to be or shall be deemed exclusive of any other such right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of the Bank, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefore shall occur. No act of the Bank shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of the Bank shall be separate, distinct and cumulative and none shall be given effect to the exclusion of any other. The failure to exercise or delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the Loan Documents, shall not be construed as a waiver or release of the same, or of any Event of

Default thereunder, or of any obligation or liability of the Borrower thereunder. Nothing herein, however, shall be construed to prevent the Bank from waiving any condition, obligation or default it should so elect. In the event of such election by the Bank, any waiver, in order to be effective, must be in writing and signed by the Bank, and any such waiver shall be strictly limited in its effect to the condition, obligation or default specified therein and shall not extend to any subsequent condition, obligation or default or impair any right of the Bank with respect thereto.

(ii) The recovery of any judgment by the Bank and/or the levy of execution under any judgment shall not affect in any manner or to any extent, liens or other security interests in any Collateral, or any rights, remedies or powers of the Bank under any of the Loan Documents or with respect to any Collateral, but such liens and security interests, and such rights, remedies and powers of the Bank shall continue unimpaired as before. Further, the entry of any judgment by the Bank shall not affect in any way the interest rate payable under any of the Loan Documents on any amounts due to the Bank, but interest shall continue to accrue on such amounts at the Default Rate (as hereafter defined).

(iii) Except as to notices that are specifically provided for herein or in any of the other Loan Documents, the Borrower hereby waives presentment, demand, notice of nonpayment, protest, notice of protest, or other notice of dishonor, and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, the Loan. To the extent permitted by law, Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect.

(iv) The Borrower agrees that the Bank may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents (and the Borrower hereby waives any notice of any of the foregoing), and that the Loan Documents may be amended, supplemented or modified by the Bank and the other signatory parties and that the Bank may resort to any Collateral in such order and manner as it may think fit, or accept the assignment, substitution, exchange, pledge, or release of all or any portion of any Collateral, for such consideration, or none, as it may require, without in any way affecting the validity of any liens over or other security interest in the remainder of any such Collateral (or the priority thereof or the position of any subordinate holder of any lien or other security interest with respect thereto); and any action taken by the Bank pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Bank, or of any Event of Default, or of any liability or obligation of the Borrower, under any of the Loan Documents.

(d) Default Rate. Upon an Event of Default or after the Maturity Date, whether or not the Bank has elected to accelerate the indebtedness evidenced by the Note, the Loan shall bear interest, payable on demand, at a rate, per annum, determined on a daily basis, calculated at the rate set forth in the Note plus five percentage points (500 basis points) per annum (the "**Default Rate**"), but in no event more than the highest rate permitted by the applicable usury law in respect of the Borrower, until the unpaid balance of the Principal Sum, interest and any charges shall have been paid in full. Borrower acknowledges that (i) the Default Rate is a material inducement to the Bank to make the Loan; (ii) the Bank would not have made the Loan in the absence of the agreement of Borrower to pay the Default Rate; (iii) the Default Rate represents compensation for increased risk to the Bank that the Loan will not be repaid; and (iv)

the Default Rate is not a penalty and represents a reasonable estimate of (a) the cost to the Bank in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Loan, and (b) compensation to the Bank for losses that are difficult to ascertain.

(e) Costs and Expenses. Following the occurrence of any Event of Default, the Borrower shall pay upon demand all reasonable costs and expenses (including all reasonable amounts paid to attorneys, accountants, real estate brokers, appraisers, and other advisors employed by the Bank), incurred by the Bank in the exercise of any of its rights, remedies or powers under any of the Loan Documents, as a secured or unsecured creditor, as the case may be of the Borrower, any general partner of the Borrower, if applicable, or any other Obligor in any federal or state bankruptcy proceedings, or with respect to any Collateral with respect to such Event of Default, and any amount thereof not paid promptly following demand therefor together with interest thereon at the Default Rate from the date of such demand, shall become part of the Loan and shall be secured by the Mortgage and all other Collateral. In connection with and as part of the foregoing, in the event that any of the Loan Documents is placed in the hands of an attorney for the collection of any sum payable thereunder, the Borrower agrees to pay reasonable attorneys' fees for the collection of the amount being claimed under such Loan Document, as well as all costs, disbursements, and allowances provided by law, the payment of which sums shall be secured by the Mortgage and all other Collateral.

(f) Jurisdiction; Venue. The Borrower agrees that any action or proceeding against it to enforce the Loan may be commenced in state or federal court in the Commonwealth of Pennsylvania.

(g) **JURY TRIAL WAIVER. THE BORROWER AND THE BANK HEREBY WAIVE ANY AND ALL RIGHTS THAT THEY MAY HAVE NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN THE BORROWER AND THE BANK OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THE LOAN AGREEMENT. IT IS INTENDED THAT THIS WAIVER OF JURY TRIAL SHALL APPLY TO ANY AND ALL CLAIMS, DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDING.**

(h) **Intentionally left blank.**

8. **Further Assurances; Corrections**. The Borrower shall, within five (5) days of the Bank's request, execute any documents, provide any lien or other searches, and do anything that the Bank determines to be reasonably necessary to establish, perfect, assure, or maintain the existence and priorities of, the Bank's liens against the Mortgaged Property, the reasonable costs of so doing to be paid by the Borrower. In case of the occurrence of any errors in the execution of the Loan Documents, the Borrower authorizes the Bank to make all necessary corrections in order to cause the Loan Documents to conform to the terms and conditions agreed to by the Borrower and the Bank.

9. **Material Adverse Change** means any set of circumstances or events which:

(a) has or could reasonably be expected to have any material adverse effect whatsoever upon the validity or enforceability of the Loan Documents,

(b) is or could reasonably be expected to be material and adverse to the business, properties, assets, financial condition, results of operations or prospects of the Borrower taken as whole,

(c) impairs materially or could reasonably be expected to impair materially the ability of the Borrower taken as a whole to duly and punctually pay or perform its obligations, or

(d) impairs materially or could be reasonably expected to impair materially the ability of the Bank to enforce its legal remedies pursuant to the Loan Documents.

10. **Miscellaneous**.

(a) Time of the Essence. All dates and times for the performance of the Borrower's obligations set forth herein shall be deemed to be of the essence of this Agreement.

(b) Severability. In the event that for any reason one or more of the provisions of this Agreement or their application to any person or circumstance shall be held to be invalid, illegal or unenforceable in any respect or to any extent, such provisions shall nevertheless remain valid, legal and enforceable in all other respects and to such extent as may be permissible. In addition, any such invalidity, illegality or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(c) Successors and Assigns. This Agreement inures to the benefit of and binds the parties hereto and their respective successors and assigns, and the words "Borrower" and "Bank" whenever occurring herein shall be deemed to include such respective successors and assigns. However, the Borrower shall not voluntarily, or by operation of law, assign or transfer any interest which it may have under this Agreement or convey the Mortgaged Property, or any part thereof, without the prior written approval of the Bank. The Bank may assign or otherwise transfer the Loan and any or all of the Loan Documents to any other person, and such other person shall thereupon become vested with all of the benefits in respect thereof granted to the Bank herein or otherwise. The Bank shall have the right to sell participations in the Loan to any other persons or entities without the consent of or notice to the Borrower. Without the consent of or notice to the Borrower, the Bank may disclose to any prospective purchaser of any securities issued or to be issued by the Bank, and any prospective or actual purchaser of any participation or other interest in the Loan or any other loans made by the Bank to the Borrower, any financial or other information, data or material in the Bank's possession relating to the Borrower, the Guarantors or the Loan.

(d) Notices. All notices required or desired to be given to either of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when presented personally to such party or sent by certified or registered mail, return receipt requested, to such party at its address set forth below:

| | |
|---|---|
| The Borrower: | Heritage Hills Associates<br>2700 Mt. Rose Avenue<br>York, Pennsylvania 17402<br>Attn: Matthew J. DeRose |
| with a copy to the Borrower's counsel: | Katherman, Heim & Perry<br>345 East Market Street<br>York, Pennsylvania 17403<br>Attn.: J. Robert Katherman |
| The Bank: | Crown Bank<br>Commercial Real Estate<br>27 Prince Street<br>Elizabeth, New Jersey 07208 |
| with a copy to the Bank's attorney: | Hill Wallack LLP<br>202 Carnegie Center<br>Princeton, New Jersey 08543<br>Attention: Nicole Perdoni-Byrne, Esq. |

Such notice shall be deemed to be given when received if delivered personally or two (2) days after the date mailed if sent by certified or registered mail, return receipt requested. Any notice of any change in such address shall also be given in the manner set forth above. Whenever the giving of notice is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

(e) Definitions; Number and Gender. For purposes of this Agreement, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require.

(f) Conflicts Between Instruments. In the event of any conflict between the provisions of this Agreement and the provisions of any of the other Loan Documents, the provisions of this Agreement shall prevail.

(g) Captions. The captions or headings of the paragraphs of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

(h) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to principles applicable to conflicts of laws.

(i) Counterparts. This Agreement may be executed in multiple counterparts and each counterpart hereof executed by any party shall be deemed an original and shall as to such party constitute one and the same instrument with all other counterparts hereof executed by any other such party.

(j) Cross-Collateralize and Cross-Default. All loans due to the Bank by the Borrower, whether now existing or in the future, shall be cross-collateralized and cross-defaulted with this Loan.

**SIGNATURES TO FOLLOW ON NEXT PAGE**

**IN WITNESS WHEREOF**, the Borrower and the Bank have executed or caused this Agreement to be executed on the date first above set forth.

WITNESS:

Nicole Perdoni-Byrne

BANK:
CROWN BANK

By: ______________________
Peggy Lane, Vice President

WITNESS:

J. Robert Katherman

BORROWER:
Heritage Hills Associates,
a Pennsylvania limited partnership

By: ______________________
Matthew J. DeRose, General Partner

## EXHIBIT A

LEGAL DESCRIPTION OF THE
MORTGAGED PROPERTY

**COMMITMENT**

**SCHEDULE C**

**File Number:** 2014-40

PARCEL NO. 1: ALL THAT CERTAIN tract of land lying and being situate partly in YORK TOWNSHIP and partly in SPRINGETTSBURY TOWNSHIP, partly in York County, Pennsylvania, being known as Lot No. 1 Golf Course, as shown on a Plan of Heritage Hills drawn for MGM Enterprises, Inc. by Devery and Assoc. bearing Sheet No. 105-042, and being more fully bounded and described as follows, to wit:

BEGINNING at a point common to the southeast property corner now or formerly of James Gable; thence North forty-five (45) degrees East, five hundred sixty-nine and ninety-six one-hundredths (569.96) feet to a point; thence North one (01) degree fifty-three (53) minutes West, three hundred fifty-five and zero one-hundredths (355.00) feet to a point; thence North eighty-eight (88) degrees forty-seven (47) minutes fifty (50) seconds East, three hundred eighty-eight and sixty-six one-hundredths (388.66) feet to a point; thence North seven (07) degrees forty-seven (47) minutes forty (40) seconds West, five hundred twenty-six and twenty-four one-hundredths (526.24) feet to a point; thence North eighty-seven (87) degrees fifteen (15) minutes twenty (20) seconds East, sixty and twenty-three one-hundredths (60.23) feet to a point; thence North eighty-six (86) degrees fifty-seven (57) minutes forty (40) seconds East, one hundred forty-three and sixty-six one-hundredths (143.66) feet to a point; thence North eighty-four (84) degrees thirty-five (35) minutes East, three hundred fifty-seven and two one-hundredths (357.02) feet to a point; thence South two (02) degrees thirty (30) minutes West, one hundred ninety and forty-two one-hundredths (190.42) feet to a point; thence North eighty-six (86) degrees thirteen (13) minutes ten (10) seconds East, five hundred forty-one and forty-eight one-hundredths (541.48) feet to a point; thence South twelve (12) degrees eight (08) minutes ten (10) seconds East, one hundred fifty-two and sixteen one-hundredths (152.16) feet to a point; thence North sixty-nine (69) degrees forty-two (42) minutes twenty (20) seconds East, fifty (50) feet to a point; thence South eleven (11) degrees forty-seven (47) minutes forty (40) seconds East, two hundred eight (208) feet to a point; thence South twelve (12) degrees thirty-eight (38) minutes twenty (20) seconds East, five hundred thirty-six and eleven one-hundredths (536.11) feet to a point; thence South seventy-seven (77) degrees thirty (30) minutes twenty (20) seconds West, three hundred seventy (370) feet to a point; thence South twenty-five (25) degrees ten (10) minutes East, one hundred thirty-one and forty-four one-hundredths (131.44) feet to a point; thence South sixty-four (64) degrees fifty-seven (57) minutes forty (40) seconds West, five hundred sixty-five (565) feet to a point; thence South fifty-two (52) degrees fifty-seven (57) minutes forty (40) seconds West, one hundred seventy-five and sixty-one one-hundredths (175.61) feet to a point; thence South forty (40) degrees fifty-seven (57) minutes forty (40) seconds West, one hundred seventy-five and sixty-one one-hundredths (175.61) feet to a point; thence South twenty-eight (28) degrees fifty-seven (57) minutes forty (40) seconds West, one hundred seventy-five and sixty-one one-hundredths (175.61) feet to a point; thence South twenty-one (21) degrees twenty-eight (28) minutes thirty-seven (37) seconds West, one thousand sixty-eight and seventy-nine one-hundredths (1068.79) feet to a point; thence South twenty-nine (29) degrees thirty-one (31) minutes thirty (30) seconds West, four hundred (400) feet to a point; thence South fifty-nine (59) degrees two (02) minutes forty-eight (48) seconds West, one thousand one hundred ninety-seven and ninety-seven one-hundredths (1197.97) feet to a point; thence North sixty-eight (68) degrees thirty-six (36) minutes ten (10) seconds West, two hundred seventy-two and ninety-eight one-hundredths (272.98) feet to a point; thence South forty-six (46) degrees fifty-two (52) minutes forty (40) seconds West, one hundred nine and sixty-five one-hundredths (109.65) feet to a point; thence North forty-three (43) degrees thirteen (13) minutes twenty (20) seconds West, three hundred sixty-eight and thirty-two one-hundredths (368.32) feet to a point; thence North fifty (50) degrees twenty-eight (28) minutes forty (40)

# COMMITMENT

## SCHEDULE C

**File Number:** 2014-40

seconds West, sixteen (16) feet to a point; thence North fifty-five (55) degrees twelve (12) minutes forty (40) seconds East, three hundred thirteen and fifty-three one-hundredths (313.53) feet to a point; thence North fifty-eight (58) degrees East, two hundred thirty-two and thirty-nine one-hundredths (232.39) feet to a point; thence North forty-three (43) degrees fifty-seven (57) minutes twenty (20) seconds West, four hundred nine (409) feet to a point; thence South sixty-two (62) degrees six (06) minutes thirty (30) seconds West, one hundred ninety (190) feet to a point; thence North thirty-six (36) degrees seven (07) minutes fifty (50) seconds West, one hundred twenty-two and ninety one-hundredths (122.90) feet to a point; thence South fifty-eight (58) degrees sixteen (16) minutes twenty (20) seconds West, three hundred twenty-seven and seventy-six one-hundredths (327.76) feet to a point; thence North forty-three (43) degrees twenty-three (23) minutes ten (10) seconds West, one hundred seventy-nine and ninety-eight one-hundredths (179.98) feet to a point; thence North forty-four (44) degrees fifty-six (56) minutes twenty (20) seconds West, ninety and ninety-one one-hundredths (90.91) feet to a point; thence North thirty-two (32) degrees seventeen (17) minutes six (06) seconds East, one thousand two hundred thirty-nine and forty-one one-hundredths (1239.41) feet to a point; thence North fifty-one (51) degrees thirty (30) seconds East, three hundred (300) feet to a point; thence North seventy-two (72) degrees twenty-four (24) minutes twenty (20) seconds East, one thousand fifteen and eighty-five one-hundredths (1015.85) feet to a point; thence South twenty-two (22) degrees eighteen (18) minutes East, five (5) feet to the point of BEGINNING.

PARCEL NO. 2: ALL THAT CERTAIN tract of land lying and being situate in SPRINGETTSBURY TOWNSHIP, York County, Pennsylvania, being known as Lot No. 5 Commercial, as shown on a Plan of Heritage Hills drawn for MGM Enterprises, Inc. by Devery and Assoc., bearing Sheet No. 105-042, and being more fully bounded and described as follows, to wit:

BEGINNING at a point in the center of a public street known as Mt. Rose Avenue, said point being a corner of Parcel No. 1 herein; thence along the center of said Mt. Rose Avenue, North eighty-four (84) degrees thirty-five (35) minutes East, two hundred seven and twenty-three one-hundredths (207.23) feet to a point; thence by the same, North eighty-six (86) degrees fifty-three (53) minutes ten (10) seconds East, two hundred eighty-five and twenty-nine one-hundredths (285.29) feet to a point; thence along lands of Heritage Hills Associates, South twelve (12) degrees eight (08) minutes ten (10) seconds East, one hundred ninety-four and thirty-four one-hundredths (194.34) feet to a point; thence along Parcel No. 1 herein, South eighty-six (86) degrees thirteen (13) minutes ten (10) seconds West, five hundred forty-one and forty-eight one-hundredths (541.48) feet to a point; thence along the same, North two (02) degrees thirty (30) minutes East, one hundred ninety and forty-two one-hundredths (190.42) feet to a point and the place of BEGINNING.